All right, our next case is United States v. Elfenbein, Mr. Mettinger. Good morning, Your Honors, and may it please the Court. My name is Jason Mettinger, and I'm here on behalf of the United States. But in many respects, Your Honors, I'm also here on behalf of the jury that heard this case. Your Honors, jury verdicts demand deference, and we respectfully submit that the jury verdicts here did not receive the deference that they were due. Your Honors, this was a health care fraud case. The jury in this case heard two weeks' worth of testimony. They heard more than 200 exhibits. They heard and saw from the defendant himself. And after all of that, the jury properly and reasonably and swiftly returned verdicts on all counts. We respectfully submit that the district court was wrong to substitute its judgment for the jury's. The district court was wrong in the standards that it applied, and the district court was wrong in granting Rule 29 relief and conditionally granting Rule 33 relief. As such, we respectfully ask this Court to reverse and to reinstate the jury's verdicts. Your Honors, I'd like to start with Rule 29, and I'd like to start specifically with the standards that we have to apply here. So I think I'm confident my colleagues understand the standards as well. Can you turn to JA 102? This is the chart, right? You can probably remember it from memory, and the words don't really matter. But do you agree that the evidence only permits the conclusion that satisfying two of the three columns is a way, not the only way, but is a way to justify a Level 3, 4, or 5 code? So, yes, I think that is some of the testimony that was involved here. I know, but what I'm asking, is there a debate about that, right? That if, acknowledging if, one were to establish that two of the three columns were met, that that would suffice to establish that the Code 4, I'm just going to call it Code 4, I know it's got a lot of other numbers before it, but that the Code 4 billing was proper. Right, so there was testimony on that, and both the government expert and the defense expert, I think, agree generally on the parameters of it. I think where we disagree, frankly, is the facts. And we have wildly disparate views of them, and our view is the jury resolved those discrepancies in our favor. And the district court applied a different standard, and that's where we think there's error. Totally get you. So, in the first column, where . . . can you point me to where your expert, if so, talked about whether these individuals, under the number and complexity of problems addressed that they encounter? Did your expert address whether this was an undiagnosed problem with uncertain prognosis? Right, that sort of particular . . . I mean, I get there are lots of different bubbles here, but that one sort of strikes me as particularly interesting. Did your expert address that issue, and if so, can you point me to where? So, where our expert addressed that was when he was talking about the codes, and he walked through the CPT manual. He didn't provide enormous amounts of gloss on it, but he did walk through what it meant. And so, he read into the record the idea that an undiagnosed new problem with an uncertain diagnosis has to represent a condition that's likely to result in a high risk of morbidity without treatment. And that's right from the CPT code, and a JA site of it is . . . Ninety-nine.  Also, JA 4663. So, it's an enormous record. So, Your Honor, in our view, this doesn't meet that standard on any of those. It's not undiagnosed. But, Counsel, I'm sorry, I didn't mean to interrupt. That expert wasn't a doctor, right? So, there is no testimony from the expert about what it means to be an undiagnosed new problem, right? He was talking about the application of the CPT, but he couldn't talk about the underlying medical issue, could he? No, he could, Your Honor. So, he was an expert and certified in coding. And so, really, that's what we're talking about. We're talking about one of our theories was upcoding. Obviously, another theory was this false documents, which we can get to. There was a number of falsities in this case. The CPT manual was only one of them, but I'm happy to talk about it. So, he certainly could talk about whether he's a certified coder. We had other certified coders that says these weren't Level 4s. Sinagra was a certified coder. There was a couple others. But, Counsel, and maybe I've misinterpreted my colleague's question, one of the issues underlying this is what was COVID? What were people who needed these tests really suffering from? And is it more like the example of the assessment of a lump in the breast, or is it more like coming in with a cold? And the doctor then, or the healthcare professional, would have to make an assessment according to that chart. Right. So, I have two responses to that, Your Honor. Number one, we're talking about experts. I do want to make the point that we don't believe that an expert here was required. That's one of the errors that we think the district court made in requiring expert testimony. Expert testimony is never required to prove an element in a criminal case. That's that Zanjar case . . . The district court didn't think too much of your expert anyway. He did not. And that drove a lot of, I think, the decision here. The district judge did not think well of our expert, and we got the results that we did. So, what I think, Judge Notman, I'll ask a question, maybe if I can . . . friendly, hopefully friendly, sort of addition to it, or revision. So, when I look at the evidence that you put on in your case in chief, where do I find sort of evidence that meets the standard, I think, that you correctly point to on J99 that your expert talked about, this high risk of morbidity? Like, where do I find evidence that, you know, young, healthy people did not face the quote-unquote high risk of morbidity from COVID? Like, how could a jury reach that conclusion based on the evidence in your case in chief? Well, so, I was going to talk to you about some of the . . . Well, two points, actually. First and foremost, they can find . . . You can talk about their evidence, too. I know, I want to talk about their experience. And I assure you we're going to get to that, but I wanted to start with what evidence you put on. You are correct that when we have analyzed this, they get the burden of the evidence that they put on, too. And so, that might make a difference here. I asked the question precisely for a reason. Understood, Your Honor. So, what is the evidence in your case in chief that would suggest to us that there was not a high risk of morbidity, at least for, you know, the general population, as opposed to someone who is old or has diabetes or some other condition that exacerbated the risk they faced? Right. So, if you look at the record that indicates the medical records for the charged counts. So, that's, you know, JA 3671, 3685, 3755. And you're talking here about the, I believe, five specific individuals? Correct. And so, you know, you look at the treatment. The treatment that was proposed was, you know, go home, rest, hydrate, use some over-the-counter medications. Combine that with the CPT manual, which says that a level two, sort of a straightforward, basic, you know, low-level medical decision making, is going to resolve by those kinds of treatments. And put those two together, and the jury is reasonably able to see that the kind of problem that was being presented here, this COVID problem, is a minimal problem, a level two problem, nowhere near the level four problem that requires moderately complex medical decision making. Now, I would like to, you know, because we talked about the defense expert here, I would like to transition to them, too, because they said... You don't have to know this, but when you say level two, the CPT manual tells us that level two resolves by sort of rest and over-the-counter. I know that their expert testified to this fact, but do you happen to know where that is in the CPT manual? So it is in here in the definition of... The CPT manual defines each and every one of these. Okay, that's where I'd find it. I don't need you to look back for me. That's where you would find it. That's fine. And then can you talk... 4663. 4663? Yeah, and that talks about a self-limited or minor problem is one that runs a definite and prescribed course, is transient in nature, and is not likely to permanently alter health status. But that's different than it will resolve with rest and over-the-counter, right? Right, but, you know, the idea that it's going to do a definite course. In other words, it's going to resolve. And the gloss that was put on it was, by other experts, simply, you know, resting and hydrating. And that's the kind of problem we're trying to solve. And you have to remember, too, what we're dealing with here. We're dealing with these drive-through COVID testing. You know, this is not a complex medical decision-making operation. And I know we're kind of getting down into the weeds of the CPT manual. Yeah, no, I'm definitely asking you to get in the weeds. Stay in the weeds for just a minute for me, and then you can come back up and talk about 30,000 feet as much as you think it's going to be helpful for you. So we talked a little bit about your case in chief, and you pointed to a few things with respect to this risk of mortality for healthy individuals. You were going to talk about the defendant's expert and how he helped you on that. Can you tell me what you think I should look at for that point? So thank you, Your Honor. So that goes back to the points we were discussing where the defense expert, Mr. Misko, says that a level 2 is something that's going to resolve with over-the-counter drugs and instructions like rest, gargling, having a sore throat, something like that. That's JA 1870 and 1901 to 1902. So he's saying that's a level 2 problem, and that is what these patients are being told in their medical records. Just rest. Use some Tylenol. And the jury can marry those two up and say, I see an expert saying a level 2 is something that you've just got to have Tylenol for. And then you look at the medical records, which the prescription is you've got COVID, quarantine, rest, take some Tylenol. And so they can reasonably infer that this was a level 2 problem, not a level 4. Let me pose a hypothetical question. I hope it's quasi-related. If we were to assume, just for purposes of argument, that we concluded, based on the record and the district court's opinion, that as a matter of law, the defendant could not be convicted only on the basis of the interpretation of the CPT manual, is there other evidence of fraud in the record that is sufficient to support the verdict? Yes. Do you want to tell us about that a little bit? Abundantly. And the first place we get to, Your Honors, is this false medical records. Both experts agree that if false medical records underlie a reimbursement request, that request is false. And so all we have to prove, and especially at this stage, all we have to believe is that the jury credited some of the witnesses to say that they had false medical records. And patient AH said that her medical records didn't match her experience at all. She was adamant about that. All of them did. Patient WR, DM, JJ. So we also have additional evidence of knowledge of falsity. There's a couple of emails in here where Dr. Elfenbein is told people aren't getting exams, and yet the medical records are saying that they're done. There's JA 4456. No one is listening to their lungs or doing any type of physical exam. Dr. Elfenbein himself said, JA 4436, we are not doing an exam, and yet all the records showed there was a physical exam. And so based on that alone, we get to falsity. But as we said, there's additional other indications of falsity, and this gets back into the CPT manual a bit, but again it doesn't go into the weeds of it. We have JA 4487, Dr. Elfenbein admitting, we're not here to solve complex problems. We're just here to test them. He also said, what we're doing is simple and straightforward. That marries up with level 1 or level 2. You also have consistent statements from a number of providers saying, these are not level 4s. You have Kathy Raymond who's saying that. You have Deborah Needle saying that. You have Crystal Raymond. She did all of these and coded some of them level 2, level 3. That's what she thought was appropriate. Dr. Elfenbein overrode her and said, no, I'm countermanding you and I'm making all of these level 4s across the board, regardless of what's going on. You had the audits which said it was wrong, the CMS guidance. There's also some circumstantial evidence. You know, the jury heard all this. So again, you have to picture the evidence as it's coming in. They're hearing testimony about a lived experience, frankly, that we all had. We all sat in those cars, waited in line, got our noses swabbed. Everybody knew what this was. The testimony came in and established what it was. And they asked themselves, is this moderately complex medical decision making? And they reasonably concluded, no, not by a country mile. Because that just wasn't what was going on here. This was an assembly line. They were just moving people through the queue. And so, again, we have to take all of the evidence as it came in. We have to construe every inference in favor of the government. And if you do that, that supports the jury verdicts. I would like just to talk very briefly about the district judge's opinion. Because I think in some instances he countermanded his own jury instructions. And that's another sort of problem that we have here. So jury instructions say, jury, I'm defining falsity. It's something that's false or fraudulent, meant to conceal. It tracks the standard jury instruction language. That's a JA 2455. And then later in the Rule 29, essentially there's a whole new element that we have to prove. You know, the judge put us in a spot where the jury instruction said X, the Rule 29 motion says Y. Interestingly, he also said, jury, you can't. What do you claim the new element was? Well, you know, if you look at what the district court said we had to prove, it wasn't just falsity. Essentially what he said was, see if I have the exact quote here. I don't have it right here, but essentially he was saying, the government has to prove that Dr. Elfenbein's subjective understanding of the CPT manual was not reasonable. In other words, you know, the jury instructions just say we have to prove falsity. And this gets into that Gennady case that we were citing, that, you know, we're not here to prove CPT manual vel non. What we're here to prove is health care fraud. And this is a larger scheme to defraud, and it goes into much more than just checking boxes on a CPT manual. The other thing I'll say just very briefly before I have to see the rest of my time is that the district judge said, jury, you can use your common sense. That was the instruction. And then when you get to the Rule 29 opinion, it says the jury can't use their common sense here. And so we see some tension and some dissonance and reversal, frankly, from the jury instructions to the Rule 29. Your Honor, I see my time has ended. That's correct. This is a complicated case, and I wanted to ask you one more question. If we were to assume that we agreed with you and reinstated the judgment of conviction, what's wrong with the district court's grant of the due trial? Because we have two very different standards. So that's absolutely correct, Your Honor. There's two points I would say on that. Number one, the real fulcrum, we have to ask ourselves, well, what's new, what's different, right? So the district judge didn't grant the mid-trial Rule 29 motion. So what was different that they put in in the defense case? I want you to come back to this, but you do agree, we don't get to review that. Even if we thought the district judge got that absolutely and completely wrong, it makes no difference. Right. We have to know. So to sort of rely on that is a little odd because it was unreviewable at the time. It's unreviewable by us now. So if the district court was totally wrong then but got it right later, that makes no difference. So I don't know why that temporal line is one that you turn to. Well, it frames it only because I want to logically think about what's different. So the one thing that was different was they had an expert that testified. So Mr. Misko testified. And to get to your point, Judge Agee, about why that was wrong, the district judge shouldn't have relied upon that expert because if you look at what that expert said, he did a cold record review. He just said, these are the medical records. I'm looking at them. I think they meet the standard that the defense suggests. But none of those medical records were accurate. So it's garbage in, garbage out. If he's relying on fake medical records, his opinion is worthless. And that's why we think the district judge was wrong to rely upon those. The second error that the district judge made in the Rule 33 context, if you look at what this court said in Rafikian, it said that we're going to reserve Rule 33 for something exceptional. In other words, we're going to reserve it not just for when the district judge thinks the jury got it wrong, which respectfully I think that's what we have here. We're going to reserve it for something more. And I would cite the Fifth Circuit case that we cited, U.S. v. Crittenden. It kind of discusses this. Can I ask whether one of those unusual circumstances would be this hypothetical situation? A situation in which one were to believe that the district court absolutely got the mid-trial Rule 29 wrong, but the defense put on enough evidence to convict, unintentionally. So perhaps, but the defense put on the evidence that led to the conviction because the government failed in its case in chief, but the defense, in an effort to defend its case, put on enough evidence from which a jury could convict. Would that be one of those sort of unusual cases, if that hypothetical existed? Would that meet this sort of like little bit of an oddity, right, where the government failed to meet its burden, the district court improperly denied a mid-trial Rule 29, and then the defense put on enough evidence to convict their client? Yeah, so very interesting hypothetical, Your Honor, but I actually don't think so, and here's why. You think that would not satisfy the Rule 30? Help me understand why that is. So, you know, I think that claim, I would see that more like an ineffective assistance of counsel kind of situation where we're going to review the strategic decision-making of the defense. Why did you put on this case that basically convicted your guy? It's not an ineffective assistance of counsel, right? They made the Rule 29 argument. The district court got that wrong. They now are between a rock and a hard place. They either sort of try to preserve that argument for appeal by putting on no case, or they, you know, join issue and put on the best case they can and try to convince the jury, right? I mean, that's a tough strategic call, but that's not an ineffective assistance of counsel kind of call. That's just like a tough call that the district court forced them to make. So it might be. In my hypothetical, of course. I guess, you know, Your Honor, what I would say is, stepping back, you know, the first principle we have to abide by is juries are supreme, and, you know, in my view, when we go down the road of subjecting. Subject to Rule 29 and Rule 33. They're not supreme. For sure. Supreme suggests that they're not answerable to anything, right? They're quite answerable to Rule 29 and Rule 33. Understood. But again, if we're talking about using them sparingly, if we're talking about using them in exceptional cases, what I would submit to you, Your Honor, is the Crittenden case, which is an en banc case of the Fifth Circuit, talks about some of the things that other courts have found. Number one that they talked about was assume the government's case had rose and fell on one cooperator. And it was, you know, your proverbial jailhouse snitch. You know, that's all we got. A jailhouse snitch said the guy confessed, and we put that guy in the stand and convict. You know, that is a thin reed to prosecute someone on, and that is the kind of situation that it's exceptional, it's extreme, it's nowhere close. Relatedly, they talked about decisions that were made in passion. Great. I think you've answered it. So I think there's exceptional circumstances, and we're not here. I'll reserve the rest of my time for rebuttal. All right. Thank you very much. Thank you. Mr. Bernstein. Good morning, Your Honors. My name is Greg Bernstein, and my partner Martin Himelis on behalf of Dr. Elfenbein. May it please the Court. I'd like to begin by saying that one fundamental flaw in the government's argument here today is the statement that everybody knew what this was about. And that could not have been farther from the truth. Let's not forget, we were in the middle of a public health emergency. Everything was shut down. People couldn't go to work. People couldn't go to school. People couldn't travel. People were dying from a disease that no one really had a grasp on or understood. So to suggest that this is just some common cold, at least as perceived at the time. Is this argument an argument about his knowledge of the falsity? I sort of understood your argument to focus not on his knowledge, in the brief at least, was a question of whether the coding was in fact false. But you open by sort of suggesting that what your real argument here is, is the doctor's knowledge and that he perhaps had a good faith, if mistaken, belief that the coding was accurate. No, absolutely not, Your Honor. That is our argument. Our argument was clear and consistent. But whether there was, like what was going on at the time, might well go to his knowledge, but does not dictate whether it was false or not. Absolutely, Your Honor. But I only bring it up because it was a response to the government's position about our expert, Mr. Misko's testimony and why it was something that was straightforward. That's all. Judge Berdara, more importantly, his opinion is clear that the issue here is the absence of falsity. Falsity is what is the heart of this case. It seems like he tied that almost exclusively to the CPT code testimony. Your Honor, as he should, because that is what the government charged. The government charged a scheme to defraud through the submission of a false statement. The false statement was the submission of a claim for reimbursement at level four. Judge Richardson, we call them levels. Sorry. It's very technical. Judge Richardson? In response to his question, if hypothetically, this is actually hypothetical, I believe that these records were indeed materially false. But the level was correct. So it's a level four. But the records were false. They made claims of things that happened that didn't happen. Whatever. They're just false. Is your argument that that would not support a conviction? And if so, why not? Well, that absolutely is our argument, Your Honor. And the reason why we make that argument is because that's what the government charged. The government charged the submission of a false claim. And our expert, the only expert, by the way, who addressed these issues, Mr. Misko, testified that if I submit falsified records on behalf of a claim, that that is not a false claim? It could be a false claim to the extent that it reflects services that were not provided. Like an exam, right? So if it says we gave an exam to this person and, in fact, they gave no exam whatsoever. Yes, but, and this is important, CMS, the Center for Medicare Services, put out an interim final rule in 2021. That's fighting a hypothetical. History and exam does not apply. That's fighting a hypothetical, though, right? So that's just saying, oh, but that wasn't false in some way, right? The point is that's still a false claim. I guess I don't actually understand that argument. Maybe just explain it a little bit. No, no, and you're right, Your Honor. I apologize. I am fighting the hypothetical. But my point here is that if you have a scenario in which the claim, the record, contains information that goes to the heart of the falsity of the claim that's being submitted, like, for example, if you submit a claim on a level four, but a provider never saw the patient and it was only a medical assistant, then that would be a false medical record, if the medical record said that. But we don't have that. Your argument is it can well be a false claim if the record is false, but there's a separate, like, materiality requirement? No, no, no. Is that what you're suggesting? That in order, you know, if it said, for example, that this person was seen by a provider and they were not, that would be material in some way? No, it's not a material... I mean, this seems like a new idea. No, no, no, no, it's not a new argument, Your Honor. It's not a materiality argument. Let me take a step back, okay? You asked the initial question, trying to hone in on what exactly are we talking about, right? And under the manual, there are three elements that will determine whether or not this is a level four. Any two of those three will get you to level four. The first is the medical decision-making, the second is the tests that are performed, and the third is the morbidity. No one disputes that the morbidity prong didn't apply, so we're left with the normal. Tell me why that is for a minute. Why does... I understand Dr. Elfenbein and your expert, is it MISCO? MISCO. Testify that the morbidity was low? Well, I'm just reading from the chart, and for moderate morbidity, examples would be prescription drug management, decision regarding minor surgery, decision regarding elective major surgery. But you agree that the risk of morbidity, which is the column three, was low or minimal? Yeah, and everyone agrees to that. So where we're left, Your Honor, where we're left is with the number of tests that are reviewed and the medical decision-making. And the number of tests is not in dispute either. There were two tests. There was a rapid test when the patient arrived, there was a later PCR test, and the rapid test was reviewed. And so there's no dispute about that. And the government acknowledges this. So the only issue is the first column, is the medical decision-making. And the only issue there is whether it's an undiagnosed new problem with an uncertain prognosis. Not a single witness, not a single witness testified what that term meant except for Mr. Musco. Their own expert gets on the stand. Okay, but help me understand this, right? So you just told me that the risk of morbidity is low, and in order to be an undiagnosed problem with uncertain prognosis, right, JA99 and both experts tell us that there has to be a, quote, high risk of morbidity. Those two can't possibly be true at the same time, can they? They can't, Your Honor. And help me understand why that is. It's because it's determined by the time in which you see the patient. You don't do an after-effect analysis. But column 3 is determined at the time you see the patient too, right? That is correct. And that's why column 3. Yes, and those tests were performed in red. They did a rapid test and it was reviewed. No, no, column 3. Oh, column 3, I'm sorry. Column 3, right, which is the risk of morbidity. Yes. You just told me the risk of morbidity was low. Yes. In column 3. Yes. At least as defined in the chart, Your Honor. And then in column 1, in order to qualify as an uncertain prognosis, JA99 tells us it has to be likely to result in a high risk of morbidity. You just told me that this is not a high risk of morbidity. Help me understand how I can say that column 3 is a low risk of morbidity, but column 1 is a high risk of morbidity. I'm trying to explain that, Your Honor. Obviously I'm not doing a good job and I apologize. You have to view this at the time of the encounter. And so you don't, when you first see the patient, you don't know what the result of the test is going to be. You don't know what the result of the PCR is going to be, which is the second test. And a lot of the rapid tests, for example, came up with false negatives, false positives. So as Mr. Misko testified, you're looking at it when the patient presents him or herself. Sure, sure. Maybe you could, after the fact, use the third column to try to justify a level 4, but that just wasn't done here because the first two so clearly fit. But the point is it's not like you go back later and review this and say, okay, well, now what really happened here? Like I'm sending the person home to just rest, for example, but also saying call your doctor. And what happens if the PCR test comes back positive? So I think, Your Honor, the focus should be on the two elements that we're relied on here. So how about help me with this? Because remember only two are required for the level 4 test. Tell me what is the evidence that I look to to determine that the differential diagnosis that represents a condition likely to result in a high risk of morbidity, where would I find that in the record? That would be in the testimony of Mr. Misko. Right. And what Mr. Misko said was that this is a pandemic and this is bad, right? And that's what Dr. Elfenbahn said, too. But, like, that's not actually evidence, right? So Mr. Misko said it would be absurd to think that this was a minimal risk. But, like, that's not evidence, right? That's like a bald conclusion that doesn't help me. What I'm asking is, is there anything that is in the record that suggests to me that for these five individuals who appeared to be otherwise young and healthy, that the risk of COVID, that they might have COVID when they showed up, presented a likely to result in a high risk of morbidity? Right. So I would say two things, Your Honor. First of all, respectfully, I would disagree about what Misko's opinion on that. I think it's more than just kind of a tautological statement. I think that he's an expert and he's drawing a conclusion. The second thing I would say, Your Honor, and this is important, at least from our perspective, it's not our burden to prove that it's a level four. It's the government's burden to prove that it's not. And they introduced no competent evidence, none, to show that it was not a level four. Go ahead. I'm sorry, Judge. I don't want to stop, but I'm going to stop. Let's say that the jury hears this and they know that a lot of people would come to these things during COVID because they wanted to go somewhere, they had to have a test. These people are, as Judge Richardson indicated, otherwise seem to be okay. And yet they're being billed at the highest level. They couldn't use their common sense to say this just doesn't make sense. No, Your Honor. Respectfully, I don't. First of all, I would say that there really is no evidence other than maybe some anecdotal, a few anecdotal statements about people coming because they wanted to go back to work, for example. There's no analysis of that. There's no direct evidence of the number of people that did that or whatever. But more importantly, and this is what Judge Berdara focused on, there are cases, and this is one, respectfully, where the regulations that apply, the rules that determine the falsity or the truthfulness of the claim that is being made, are not something that an average jury would understand. These are very complicated terms. Even the government's own. You understand that the jury was given the question of whether this is a high risk of morbidity, right? And the CPT code tells us directly that you would apply the common language usage meanings of such terms as high, medium, low, or minimal risk. Juries are able to do that. I mean, that's the common language usage. The CPT code is telling us this ain't complicated. Once you get to this question, is there a likelihood of a high risk of morbidity, we apply the common language usage meanings. That's exactly what juries do all the time. Yes, sir, but the government's own expert said that this terminology was ambiguous. The government's own expert said that. Not this phrase. He never said this phrase was ambiguous. I didn't see anybody argue that high risk of morbidity was itself ambiguous. But at the time that the patient presents for the encounter, there is a potential risk of morbidity because of what was going on at the time. That's what Mr. Misko said. Well, there would always be some theoretical, metaphysical concept that there would be a risk of morbidity. Focusing on the five particular individuals here, what evidence is there in the record that they were subject to some high morbidity risk? The evidence, again, Your Honor, is that they're there because they were afraid that they might have been exposed. And even if they didn't say that they might be exposed, three of them, I think, said that they had symptoms, or two of the five. I forget if it was two of the five or three of the five. But, again, the regulations and the guidance were clear that you were to presume exposure to COVID. And at the time, the risk was high. You did not know what was going to happen. So, counsel, to be clear, are you disagreeing with your colleague's statement that expert testimony was not required of the government? Are you saying that in this particular circumstance, that they needed to present medical testimony? Yes, sir. Your Honor, that's exactly what I'm saying. And that's what Judge Bourdard found in his 90-page opinion. And he made that very clear, that there are instances where you have a complicated regulatory scheme like this with terms that are not easily understood. When the government's own expert acknowledges that they're not easily understood, that expert testimony is required to explain those terms. Because, otherwise, you're left with what the government did at trial and what they did in their briefs and what they do here today is they revert to Dr. Elfenbein's subjective intent and things that he said and did. And that is a conflating of the two elements that's just not allowed. Do we have any instance in which, you know, a regulation tells us to apply the common language usage meaning of words like high risk of morbidity and suggests that that common language usage can only be understood through an expert? And if it's going to be an expert, it shouldn't be a doctor. It should be a linguist, right? You should get somebody who's a linguist to understand what the common language usage is. Well, Your Honor, I am certainly not aware of any regulation in the CPT manual that says that. That's for sure. I'm reading from it. What? That's JA 100. Apply the common language usage meaning to terms such as high, medium, low. I'm literally reading the blank. Your Honor, I misunderstood the question. But that's the point that I was making earlier. And the government's own expert along with Mr. Misko said that you can't just rely simply on that common use. You can't just rely on what's in the manual. You've got to look at the guidance. You've got to look at the other regulations that come out. That's how you define these terms. And I just think it is grossly unfair in a case like this with complicated terminology, with these different levels to say that the jury should just use its common sense. I'm sorry to interrupt, but to go back to the very beginning of the argument, I'm unclear on why the jury couldn't consider the falsity of information about the five individuals receiving particular exams that didn't happen. Okay. And, of course, the defense could argue, well, that was an accident. It was a template. They made a mistake. But the jury was able to consider the fact that they said, oh, they took your temperature. I never had my temperature taken. I talked to a doctor. I never talked to a doctor. Why is that not a legitimate area for the jury to decide that it was false as opposed to some other explanation? Yes, Your Honor. I understand your question. And it would be relevant if history and exam were criteria or factors that were utilized in determining what was the appropriate level. But in 2021, CMS issued an interim final rule which specifically said that in making the determination which level, history and examination do not apply. Well, I understand that, but why couldn't a juror conclude that it made it more likely that this was part of a scheme to claim a higher level than was medically appropriate? And the evidence of that, in part, was a willingness to make up things on the documents. Because it's not the regulation, if I can add on to Judge Nachmanoff's question. It's not that the regulation made a change in definition. It's that tests and other things that were said to have happened didn't happen. And I don't see how the regulation makes a difference there. Well, there is, importantly, no evidence in this record, none, that Dr. Elfenbein instructed any one of his providers to put down false information in the medical records. That's a different way of just saying it was an accident. Your argument is that that was accidental. Well, I am because, Judge, what you're suggesting to me is couldn't the jury decide based on that? And what I'm saying is that's not the case that the government presented. And, in fact, there's multiple instances where the government said on the record, we are not arguing that the patient was not seen by a provider. That's a direct quote from the government. That wasn't their case. Their case was about whether or not level four was the appropriate claim for this encounter. And to determine whether level four was the appropriate level for this encounter, the government had to prove that that was false. And the falsity is based on whether or not it was not an undiagnosed new problem with an uncertain prognosis, because all the other factors are agreed upon. And who defines what undiagnosed new problem with uncertain prognosis is? Only Mr. Misko. No, well, the CPT code does, right? We read it earlier, right? It's likely to result in a high risk of morbidity. Right. Right? I mean, that's the definition. That definition comes out, actually, from both experts, I believe. They read that part. It's introduced into evidence. Can I ask a question with judges' permission? Your Honor, I'll stand up here all morning. No, I wasn't asking for your permission, I assure you. So your client testified at 2239. I know you don't have it in front of you. No, I don't, Your Honor. Just accept my representation here. I'll read it to you. Where he says, what about the third column, morbidity or mortality? Did you look at that? I did. I didn't see anything that fit what we were doing for the vast majority of our COVID patients, so you know it was very low, minimal or low risk. I asked this question in a different way earlier, but I'll ask it to you now because it might matter, to me at least. That seems to be testimony from your client that the risk of morbidity at the time of presentation was low or minimal. And if that is true, then it cannot be, in my mind, an undiagnosed problem with uncertain prognosis because there's not a high risk of morbidity. We just said your client said it was a low risk of morbidity. Do you want to have a crack at explaining why that evidence alone from your client is not sufficient to say that a jury could have concluded that the risk of morbidity from COVID, you know, whatever it is, less than 1%, right, they're sort of like intelligent people, that your client agrees that there's a low risk when it presented to them? Right. So I would say two things, Your Honor. Great. Number one, respectfully, I think this is conflating again what the government did with subjective intent, with falsity of the statement. Because Dr. Elfenbein could have been wrong. He could have been wrong. There are many, you know, if the defendant, in another use of hypothetical, if the defendant thinks that he's Well, when you say he could have been wrong, wrong about what? Whether or not it's low or high morbidity. I'm sorry, Judge. Whether it's low or high morbidity. And he could have been wrong. You have to focus it. We're focusing on the falsity prong. And whether or not the statement is false, you have to look at that. So that's number one. He could have been wrong. And so I understand that argument. So your argument there is the jury should have disregarded his testimony as a doctor, that there's a low risk when you're presenting with COVID. I understand that argument. But let's assume it's not a helpful one for you. How about go to the second argument? Well, to turn it back, Your Honor, I think that you're setting up the construct a little wrong. It's not a question of the jury accepting or not accepting what Dr. Elfenbein thought. It's a question of whether the government has presented competent evidence to prove that Not on the Rule 29 inquiry, right? So we have to take every inference in favor of the government. Your Rule 33 argument might be better. But on Rule 29, it actually sort of flips that around a little bit. And I've got to see, is there any inference that can be drawn? Well, and perhaps let's just imagine, like, a medical doctor testifying, any medical doctor testifying that they present with a low risk of morbidity, like, is some evidence that, like, folks showing up for testing presented a low risk of morbidity. Right. But again, Your Honor, what I would say, even at the stages, if there's not competent evidence I'm sorry. I just didn't hear what you said. Even if what now? What I was saying, Your Honor, was that I forget where I was beginning. But the point I was trying to make.  Let me try to make my point. The point, oh, I think what I was saying is I was respectfully pushing back a little on Judge Richardson about the current standard. And what I was going to say is that if they don't present competent evidence by which a reasonable jury could find that the level four was reached, then the Rule 29 is appropriate. That's what Judge Berdara found. So let's just, I want to hear your second point, but let me just follow up with this, if you don't mind, Judge. If the government had put on a doctor expert, they didn't, I understand this, but hypothetically, if they had put on a doctor expert who said, I find that the risk of morbidity from a patient showing up, a healthy patient showing up with COVID exposure is minimal or low. Do you agree that had they put that evidence on, that that would be sufficient for a jury to find that this is not an undiagnosed problem with an uncertain prognosis? Might not mandate that they find it, but it would be sufficient evidence, right? You're not going to let me cross-examine that expert? Well, yeah. Not reviewing Rule 29, but you get my point, right? I do, Judge. That would be some evidence. And I'm being a little flippant. I apologize. No, no, that's fine. I don't mind it. Okay. I can tell. That would be, yes, that would be some evidence. Some evidence. But the point, again, Your Honor, is that it's not how the manual is set up. If you meet the other two elements, then, you know, you've reached the level four. And finally, the last, Judge, if I can just make the response. The second point, yeah. Yeah, one sentence. Because I'm going to come back to what I've been saying, I think, consistently is, you do have to look at Mr. Misko's testimony. He addresses this issue and talks about why he believes that the uncertain prognosis was there because of the state of play, so to speak, at the time. And I think that's enough. There's certainly no other evidence that shows that the government didn't present any. Well, before you sit down, I'd like for you to take about two minutes and give us your response to the government's Rule 33 argument. Well, Judge, as you noted, the standard, of course, is very different. And Judge Bredar, you know, found that there simply was not enough evidence to support. He looked at the testimony of each of the witnesses and found that that was not sufficient. And with the different, making his own assessment, if you will, of the evidence, he found that that was not enough. And so that would warrant a new trial. All right. Thank you very much. Mr. Mettinger, you've got a little rebuttal time. So thank you, Your Honor. I'd like to go back to a point that you raised with my colleague about, you know, common sense and juries. And that really is the crux of our argument, Your Honor, that juries can use their common sense. We trust juries to make this decision. In other words, they have to find the criminal element of whether it was false or not. They did. There's certainly enough here in the record, in our view, crediting all the inferences. And so, you know, we think that should drive the analysis. I want to mention Sarwari. That was this Court's decision. And it talks about who are we going to trust to decide arguably ambiguous terms. This Court said very clearly we're going to trust juries to do it. There's a really long footnote where the district judge basically tosses Sarwari aside. I think that's an extra ground for error. I think we have to follow this Court's precedence, which say juries find the elements. The second thing I want to respond to that my friend said, you know, he did say, just as Judge Bredar did, that in this case expert testimony is required. Again, we disagree with that for the reasons we've stated under Sanjar. Also, I just think it's extra constitutional. It's extra legislative. In other words, you know, Congress passed a health care fraud statute. They didn't say that it had to be proven by expert testimony. I think that is just sort of adding an element or a thing that the government has to do that just is not there in the statute. But you were going to try to prove it by expert testimony. We can prove it if we wish, but we don't have to. And again, their argument and Judge Bredar's opinion, JA 6015, 6017, he's saying over and over again, essentially expert testimony is required, and that's wrong as a matter of law in criminal law. Judge Richardson, getting to the questions that you had about this high risk of morbidity, I actually had in my notes the very quote that you had on JA 2239 where Dr. Elfenbein says there's a low risk. So I think based on that admission alone, they can't get to these level fours. But I'll also point out JA 4487. That's an e-mail from Dr. Elfenbein, and he basically says that, look, if these patients look bad, if there is something that is actually wrong with them where they require care, we're not taking care of them. You send them to the ER. I think the jury can reasonably say if that is the construct here, you know, this is not somebody with a high risk of morbidity. If they have a high risk of morbidity, they're not being seen by this clinic. They're being sent down the road. And so I think the jury could reasonably say there was no risk of high morbidity here. They were dealing with asymptomatic patients. That's the thing we have to remember. These people sitting in their cars were asymptomatic, and so they weren't showing any signs of morbidity. But you could face a high risk of morbidity and be effectively asymptomatic, right? That's the very example of the lump in the breast, right? That doesn't help us answer the question. The fundamental question comes back as, like, for these five people, given their health profiles, ages, diabetes, and the like, did they face a high risk of morbidity, right? It can't, it seems like to me, be a question of whether they're symptomatic today or not, and if they look really bad, send them to the ER, right? That's a reflection of how acute it is at the moment. The question we've got is what is their risk of morbidity, and that question can't be answered by simply asking how they feel today. Right, I get your point. The only small quibble I'll have, Your Honor, is I do think a lump in the breast is a symptom. In other words, you feel it there, that's a thing. These patients had nothing, and so that's a small quibble, but I take your point. Your Honor, I also want to just mention for the record again that, you know, we have this very elaborate defense about the CPT manual. It came out uncrossed that Dr. Elfenbein didn't even consult it before coming up with this whole scheme, so this was all post hoc, this was all after the fact. So, Your Honor, I think the jury reasonably gave zero credibility to that. It was a post hoc created defense. So at the end, Your Honor, I'll just conclude by saying, you know, the jury did the hard work here. They weighed the credibility. Certainly we believe that their judgment deserves deference, and so we ask that you reverse. Thank you. We thank both counsel for their excellent arguments. We're going to come down and greet you, and then we'll move on to our last case.
judges: G. Steven Agee, Julius N. Richardson, Michael Stefan Nachmanoff